### 26934. STARK v. MOULTRIE BANKING COMPANY.

DECIDED NOVEMBER 10, 1938.

*Marlin L. Bivins,* for plaintiff. *John T. Coyle,* for defendant.

BROYLES, C. J. Homer Stark sued the Moultrie Banking Company to recover real-estate commissions. The court granted a nonsuit, and the only exception is to that judgment. The petition as amended substantially alleges that "petitioner is a real-estate broker doing business" in Colquitt County, Georgia; that "defendant is indebted to . . petitioner in the sum of . . $192.50," with interest thereon at seven per centum per annum from April 15, 1934; that on January 1, 1928, the "defendant . . contracted with and employed petitioner, as a real-estate broker, to obtain offers to purchase, secure purchasers for, and to sell certain property owned by defendant in the City of Moultrie, Georgia, including . . the Mae Nace Doyle home place," the defendant agreeing "to pay the plaintiff the usual real-estate commission of five per cent. on the . . purchase-price of all property sold under said contract through his efforts;" that "at various times following such agreement the defendant reaffirmed same and insisted that petitioner continue his efforts to sell this property, together with the other properties owned and controlled by the defendant in the City of Moultrie;" that the defendant so reaffirmed said agreement on January 4, 1933, November 7, 1933, and January 15, 1934; that said agreement was never rescinded or terminated; that on April 1, 1934, "petitioner made contact with one David R. Cohn, a prospective purchaser, who informed petitioner that he wished to purchase a home in Moultrie, Georgia, on behalf of himself and his wife, Mrs. Alice L. Cohn, and showed said property to him and entered into negotiations with him to sell said property to him and his said wife;" that "petitioner . . informed said David R. Cohn that said property was the property of the defendant, and that the defendant would have to be interviewed before a sale of said property could be closed;" that on April 4, 1934, "and before any trade had been made between said prospective purchasers and the defendant, petitioner put the defendant upon notice that he expected a commission upon any sale of said property made by them to said prospective purchasers, and informed the defendant that he was negotiating with said prospective purchasers for a sale of said property and requested them to quote said prospective purchasers a price that would include his usual real-estate broker's commission on sale of said property, and the defendant then and there agreed so to do;"

that on April 10, 1934, the defendant sold said property to said Cohn and his said wife for $3850, "completely closing the trade between them;" that "petitioner procured for the defendant said prospective purchasers ready, able, and willing to buy said property, and said prospective purchasers entered into a written contract of purchase of said property with the defendant, satisfactory to the defendant;" that "petitioner . . entered into negotiations that resulted in the said sale and his efforts were primary moving factors instrumental in bringing about said sale, and that he was the instrument bringing the parties to said sale together and the procuring cause of said sale;" that "the usual . . commission on like transactions in . . Moultrie . . is five per cent. of the purchase-price of the property sold;" that petitioner's "services to the defendant in connection with said sale were reasonably of the value of . . $192.50;" and that "said sum is past due and unpaid, and the defendant . . refuses to pay the same, or any part thereof, though often demanded so to do."

Under the contract pleaded in this case, the defendant agreed to pay the plaintiff five per cent. commission on the "purchase-price of all property sold under said contract *through his efforts.*" (Italics ours.) The plaintiff testified: "On any sales made or offer accepted by the bank *through my efforts* they would pay five per cent. commission." (Italics ours.) The petition alleges that "petitioner . . entered into negotiations that resulted in the said sale, and his efforts were primary moving factors . . in bringing about said sale, and that he was the instrument bringing the parties to said sale together and the procuring cause of said sale." The uncontradicted evidence shows that the defendant sold the property in question to the Cohns, and the controlling question in the case is whether, as alleged in the petition, the plaintiff's efforts were "the procuring cause of the sale." The Code, § 110-310, declares that "if the plaintiff fails to make out a prima facie case, or if, admitting all the facts proved and all the reasonable deductions from them, the plaintiff ought not to recover, a nonsuit shall be granted."

The only witnesses who testified in this case were Homer Stark, the plaintiff, and David R. Cohn, who with his wife, Mrs. Alice Cohn, purchased the property. We shall undertake to state the substance of the testimony of these two witnesses that is pertinent

to the issues in this case. On direct examination the plaintiff testified that his "relation with the Moultrie Banking Company as agent dates back to 1927;" that he made sales for them in 1927 and 1928; that his agreements for "the sale of their properties" were "verbal;" that "from time to time some officer of the bank would call my attention to some real estate . . with request that I try to get some buyer for this property;' that he started to sell the Doyle properties for the bank in 1931, and sold four of them; that the "Mae Nace Doyle house" was "part of the Doyle properties;" that "on any sales made or offer accepted by the bank through my efforts they would pay five per cent. commission;" that plaintiff's "original agreement started with Mr. M. L. Lee," and "other officers" who asked him to "continue" his "efforts" were Mr. E. M. Vereen and Mr. Benenson; that "the last request . . was . . in January of 1934, after Mr. E. M. Vereen became active vice-president of the bank," when "he called my attention to unsold property, and asked me to help get buyers for it;" that he "was not given a price on this Mae Nace Doyle house in connection with the sale to Mr. Cohn," but "prior to that . . when another prospective purchaser was figuring on the house they quoted $4500;" that he never had any notice from the bank to discontinue his efforts to sell the property; that on the other sales of the Doyle properties he had no trouble in collecting his five per cent. commissions; that about April 1, 1934, David R. Cohn, who had previously told plaintiff that "he was going to be a prospect for a lot or a home," stopped him and said "he was ready to look at real estate, either wanted to buy a lot or a house;" that plaintiff took Cohn in plaintiff's automobile and "pointed out to him various . . lots and houses" in different parts of Moultrie, "including the Doyle house, . . and told . . Cohn there was a nice, well-located house" that would make him "a nice home;" that "he asked who owned the property" and plaintiff said "Moultrie Banking Company;" that Cohn then wanted to know the price, and plaintiff told him that "the last price quoted . . was $4500, and in order to get any different price, a new price, I would have to confer with the bank;" that when they "returned back up town to the office" Cohn said that he would show his wife the various properties plaintiff had shown him, and let plaintiff know "in a day or two as to which one of these properties he was most in-

terested in;" that "in about two or three days after that" Cohn stopped plaintiff in the street and told him that "he had asked the bank to quote him a price on the Doyle house and suggested" that plaintiff "contact the bank for protection of" his "commission;" that plaintiff went directly to the bank and told Mr. M. C. Farley, "the only officer on duty at that time," that Mr. Cohn had told plaintiff that he had asked the bank to quote him a price on the Doyle house, and that plaintiff wanted to advise the bank that "when they quoted this price to Mr. Cohn to include the regular commission of five per cent.;" that Farley said "he would make a notation of that and put it on Mr. Lee's desk;" that a few days later Mr. E. M. Vereen came to plaintiff's office and told him that Mr. Cohn had submitted him a proposition on the Doyle house, but that he couldn't trade "on the offer he had made and pay a commission;" that plaintiff told Mr. Vereen that he had notified the bank that Cohn was his prospect, "with the request that they quote the price including the commission, and that if they couldn't trade on his offer, not to sell him;" that Vereen told plaintiff that the offer was $3850, and asked what would be "the regular commission;" that plaintiff replied "$192.50;" that Vereen said that "they couldn't make the trade on that basis, and that rather than pay $192.50 commission they would call the deal off;" that plaintiff said, "Well, that will be all right, call it off;" that Vereen said he might get Mr. Cohn to pay him $25, and plaintiff told him that if the sale was consummated the bank would owe him the regular commission; that after the contract for the sale of the property had been made by the defendant and the Cohns, plaintiff made several demands for his commissions, but "they ignored each demand;" that during this conversation Vereen stated that Cohn had told him about plaintiff's "showing him the house," and "represented that the sale had not been closed" and wouldn't be closed "on the basis of paying the requested commission."

On cross-examination the plaintiff testified that the bank "did not even own the Doyle property on January 1, 1929;" that it "was acquired by the bank in 1931," and plaintiff "started work on the sale of all these properties . . that year;" that Mr. Lee asked plaintiff "to try to get some buyers for them and help the bank sell them on the regular brokerage real-estate plan;" that plaintiff did not remember whether "a specific price was made on

each . . piece of property or not;" that he did not remember "terms being discussed other than subject to approval of the bank;" that Mr. Lee quoted plaintiff a price of $4500 on the Doyle house sometime during 1931, 1932, or 1933, "in connection with some other prospect;" that in January, 1934, when Mr. Vereen called plaintiff's attention to the fact that they had some properties in the city they wanted to sell, and asked him to continue his efforts in trying to secure buyers for them; that plaintiff did not remember whether any particular piece of property was discussed; that "this particular piece of property and another Doyle house . . was still unsold;" that nothing was then said about any price on the Doyle house, and the terms of sale were not discussed; that defendant had paid plaintiff five per cent. commission on the other sales made by him for defendant; that before any of the other sales were consummated, plaintiff either got from defendant a price and terms thereon, or submitted to it "an offer from the buyer;" that plaintiff consumed about an hour or more in showing Cohn houses and lots in Moultrie; that they did not stop at the Doyle house, but plaintiff did discuss with Cohn its location and advantages for a home; that at the time Cohn got out of plaintiff's car plaintiff "had no knowledge he was interested in the purchase of the Doyle property;" that Cohn did not express a preference for any particular piece of property, but said he would get in touch with plaintiff and let him know which piece of property he was interested in; that plaintiff "was interested in selling the property he wanted," and did not "go to the Moultrie Banking Company for price or terms," because he was "waiting to hear from Mr. Cohn again about what property he was interested in;" that it was about three to five days after plaintiff notified Mr. Farley that he wanted the bank to include his commissions in any sale made to the Cohns, before plaintiff saw Vereen; that plaintiff was to get purchasers for the bank's property, not "sign him up on paper or anything;" that Vereen told plaintiff that no sale had been closed on the property in question, but that plaintiff "had been advised that a verbal agreement had been reached."

David R. Cohn testified, in part: "We were riding back toward town. . . I noticed the newly-painted house, . . and . . said, 'Whose place is that?' And he told me it belonged to Moultrie Banking Company, and they had just fixed it up for Dr. Mc-

Ginty to live in, and that it was a nice home. I asked him what they wanted for it, and he said he couldn't tell me, . . that it had been some time since he had had a price on it. At the time I went out with him I had no idea of buying a house. . . I told him I would take Mrs. Cohn . . and look at some of the things we had seen, . . and see him later. . . I think it was the next day that I took Mrs. Cohn out with me, and while we were riding showed her the house Colonel Harris was living in . . and this Doyle house. . . I said: 'We can't buy a house, because we haven't . . any money, but I know this place belongs to Moultrie Banking Company, and I am going to talk to Gene [Vereen] and see if they have any property, and, because I do business with the bank, maybe it will be possible for me to buy a house without paying a large sum down.' . . There is no explanation other than I have explained why I saw Vereen instead of coming back to Mr. Stark. . . When I got in touch with Mr. Vereen I asked him about this house. . . I told him it was Mr. Stark who had showed it to me. I told Mr. Vereen . . he [Stark] had shown me . . probably fifty or seventy-five . . pieces of property, . . lots and several houses, and I told Gene . . that I later got the idea the bank might have a piece of property I could buy without making a substantial down payment. . . I went to him [plaintiff] and told him that my wife and I thought we would like to get a lot somewhere in the southern part of Moultrie. . . I am positive I merely discussed lots at that time, . . because at the time I had no idea of buying a house. Didn't have any money with which to make a payment. . . As we came back to town, we came on the street on which the Doyle house was located . . and [I] asked whose place was that. . . He did not stop the car or make any effort to stop and show me the house. He may have slowed up some. He did not then tell me he would like to sell me that house, give me a good price, terms on it. . . He did not tell me it was a desirable location. . . I am positive he didn't say that he had a price of $4500. We then came on to town. Mr. Stark did not make any effort of any kind to sell me the Doyle property up until . . I got out of the car. . . I believe we made this round in the morning; I am not positive. . . There was no definite promise to see him. . . At the time I got out of the car nothing . . Stark said or done then made

me decide I wanted to buy the Doyle house. After I got out of that car Homer Stark never came to me and suggested that I buy, or had any conversation at all about the Doyle property. . . Quite sometime after I had closed the deal with the bank, to my best recollection . . about ten days, maybe a week, . . I met Homer in front of the Moultrie Banking Company. I am positive I had already closed the trade. . . I said: 'I have bought the Doyle house from the Moultrie Banking Company, and it might be a good idea for you to tell Gene you called it to my attention, and he may give you something for calling my attention to it.' . . He said: 'Thank you.' : . I say it was at least a week after I got out of the car, and possibly ten days, before it was mentioned between us. During that week or ten days Stark never came back to me and tried to sell me the Doyle house or any other house." On redirect examination, Cohn testified, in part: "Well, this contract [indicating contract introduced in evidence by plaintiff] was drawn ten days or two weeks after I had traded with Moultrie Banking Company. . . Until this contract was drawn up there had been no written agreement between me and the bank. I think I paid $50 on the property before the contract was signed up, but I am not positive whether I paid it before or after that. . . [Examining the contract]. Well, this indicates that I probably didn't make the payment."

The plaintiff introduced in evidence "a rental agreement, with option to purchase, entered into between Moultrie Banking Company and David R. Cohn, dated April 14, 1934, under which Moultrie Banking Company gave David R. Cohn an option to purchase . . the . . Mae Nace Doyle home place . . for . . $3850;" said agreement providing for "monthly rental payments of $50 each beginning May 1, 1934." The option was extended to May 1, 1936, and was marked, "Satisfied October 1, 1935." The plaintiff introduced also a warranty deed from "Moultrie Banking Company to David R. Cohn and Mrs. Alice Cohn, dated August 27, 1935, . . made upon the exercise of the option, . . and conveying the same lands for the same purchase-price."

The plaintiff testified that he spent about an hour or more in pointing out to Cohn houses and lots in Moultrie, including the Doyle house, and that, though he did not stop his automobile in passing that house, he did call Cohn's attention to its advantages

for a home, and told him that it belonged to the defendant. This appears to be about the extent of the plaintiff's efforts to sell that property to the Cohns; for he did not know which of the numerous places Cohn preferred, and did nothing further in that direction, because he was waiting for Cohn to show those places to his wife and express a preference. Cohn testified that he made no definite promise to see plaintiff again—that he merely told plaintiff that he would show Mrs. Cohn some of the lots and "see him later," and that "at the time I got out of the car nothing Homer Stark said or done then made me decide I wanted to buy the Doyle house. After I got out of that car Homer Stark never came to me and suggested that I buy, or had conversation at all about, the Doyle house." If the plaintiff's efforts were so futile that after he had pointed out to Cohn "probably fifty or seventy-five various pieces of property," the plaintiff was unwilling to pursue the matter further and waited quiescent for Cohn to express a preference for some particular place, and never afterwards made any effort to sell the Doyle house, it could hardly be fairly concluded that the place was sold "through his efforts." Our view is that the evidence not only fails to show prima facie that the plaintiff was the procuring cause of the sale of the Doyle house to the Cohns, but that, "admitting all the facts proved and all of the reasonable deductions from them, the plaintiff ought not to recover." We hold that the nonsuit was properly granted.

*Judgment affirmed. MacIntyre and Guerry, JJ., concur.*